# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

QUENTIN M. NEAL,

        **Plaintiff,**

v.                              **Case No. 22-CV-832**

ROBERT WINEMAN, *et al.*,

        **Defendants.**

---

## DECISION AND ORDER

---

Plaintiff Quentin M. Neal, who is representing himself and confined at Waupun Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Neal was allowed to proceed on a claim under the Eighth Amendment against defendants Robert Wineman, Ashley Haseleu, Dr. Cheryl Jeanpierre, and Dr. Eric Nelson for alleged deliberate indifference to his Achilles injury. The defendants filed motions for summary judgment. (ECF Nos. 34, 40.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 6, 13, 18.)

## PRELIMINARY MATTERS

Wineman, Haseleu, and Dr. Jeanpierre (the State Defendants) and Dr. Nelson, in their reply briefs in support of their motions for summary judgment, argue that Neal failed to follow Federal Rule of Civil Procedure 56 and Civil Local Rule 56 in his response materials. Specifically, they say that Neal does not properly cite to the record or properly respond to their proposed findings of fact. (ECF Nos. 57 at 3; 54 at 3-4.)

District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). While Neal's response materials do not formally conform with the rules, his response contains sufficient information to allow the court to rule on the defendants' motions for summary judgment. Neal submitted his own proposed findings of fact, and while his cites to the record are somewhat ambiguous, the court can still mostly discern to what he is referring. He also submitted a declaration, swearing to certain facts. As such, the court will consider Neal's response materials where appropriate in deciding the summary judgment motions.

## FACTS

The general timeline of Neal's medical care is largely undisputed. During all times relevant, Neal was incarcerated at Waupun. (ECF No 36, ¶ 1.) Dr. Jeanpierre was a physician who worked at Waupun from April 2021 until August 30, 2022. (*Id.*, ¶ 2.) Haseleu was a registered nurse who worked as a Nurse Clinician 2 from April 2019 to July 2021, at which time she became the Assistant Health Service Manager at Waupun, the position she currently holds. (*Id.*, ¶ 4.) Weinman worked at Waupun as the Health Services Manager from September 2020 through November 2022. (*Id.*, ¶ 6.) At all times relevant, Dr. Nelson was employed by the Fond du Lac Regional Clinic as an orthopedic surgeon. (ECF No. 44, ¶ 3.)

2

*Dr. Jeanpierre's and Dr. Nelson's Treatment*

On April 5, 2022, Neal injured his foot while playing basketball. (ECF No. 36, ¶ 8.) Neal states that he injured his right Achilles tendon at that time. (ECF No. 58, ¶ 5.) He was examined that same day by non-defendant Nurse Brad Taplin, who, according to Neal, "ignored Neal's description of injury, minimized his injury, and refused to schedule Neal for any further care." (*Id.*, ¶ 6.) The next day, April 6, 2022, Neal was examined by non-defendant Nurse Whitney Pitzlen, who referred him to "be seen by his care provider." (*Id.*, ¶ 7.) Pitzlen noted that Neal reported a history of Achilles tendon rupture, and she sent the results of her examination to Dr. Jeanpierre. (ECF No. 36, ¶ 10.) It is undisputed that Dr. Jeanpierre, after considering Pitzlen's report, ordered the following: lidocaine topical cream; 325 mg of acetaminophen to be taken four times a day; 200 mg of ibuprofen to be taken four times a day; an exception to the policy to allow Neal to keep his medication on his person; a lower tier restriction; crutches; an ice bag; and a reassessment. (*Id.*, ¶ 11.) Neal states that the crutches he was given were broken "because they believed he was crying wolf." (ECF No. 52, ¶ 3.) He does not specify who "they" was.

On April 8, 2022, Neal states he was examined by non-defendants Nurse Andrea Bleecker and Nurse Allison Hoehenstern. (ECF No. 58, ¶ 8.) The defendants assert that Dr. Jeanpierre examined Neal on April 8, 2022. (ECF No. 36, ¶ 13.) Neal states she did not. (ECF No. 58, ¶ 8.) According to Neal, Hoehenstern "suspected [an] Achilles rupture" and scheduled him for an emergency appointment with the physical therapist. (ECF No. 58, ¶ 9.) The defendants assert that at the April 8, 2022, exam,

3

Dr. Jeanpierre "observed swelling on the inner side of [Neal's] ankle at the end of the tibia, on the outside of his ankle at the end of the fibula and on the back part of the tibia portion near his Achillies tendon." (ECF No. 36, ¶ 13.) As a result, Dr. Jeanpierre ordered an x-ray for Neal's ankle; ice for seven days; and a referral to physical therapy to fit Neal with a walking boot. (*Id.*, ¶ 14.)

The medical records confirm that Dr. Jeanpierre examined Neal and made these orders; Bleecker was also present. (ECF No. 37-1 at 21, 39, 49.) Neal visited the physical therapist (not a defendant and not identified in the record) that same day and was given a walking boot and better-fitting crutches. (ECF No. 36, ¶¶ 15-16.) At that appointment, the physical therapist noted that, if the x-rays "showed no bone abnormalities, then the physical therapist would recommend diagnosing Neal with an Achilles injury and would recommend treating the injury with conservative management." (*Id.*, ¶ 18.) It is unclear from the record what the physical therapist considered "conservative management."

On April 12, 2022, Neal received an x-ray of his ankle, which showed "no acute fracture or dislocation, intact bone structure, preserved joint spaces, and unremarkable soft tissues." (ECF No. 36, ¶ 20.) In other words, Neal "had no acute bone abnormalities." (*Id.*) Also on April 12, 2022, Neal requested additional pain medication, to which Dr. Jeanpierre responded by ordering 400 mg of ibuprofen to be taken 3 times a day for 14 days. (*Id.*, ¶ 21.)

On April 15, 2022, Dr. Jeanpierre examined Neal and discussed his x-ray results. (ECF No. 36, ¶¶ 22-23.) She told Neal that the x-ray "did not show any acute

4

fracture or dislocations" and noted that he was scheduled for physical therapy. (*Id.*, ¶ 23.) Neal asserts that Dr. Jeanpierre "minimized his injury to a sprain and determined he'd need no further medical treatment." (ECF No. 58, ¶ 11.) The medical records indicate that Neal told Dr. Jeanpierre he believed he had a sprain. (ECF No. 37-1 at 31, 38, 45.) After the exam, the medical records indicate that Dr. Jeanpierre ordered ice for 90 days; increased Neal's pain medication to 1000 mg of acetaminophen twice daily for 180 days; and ordered an MRI. (*Id.*; ECF No. 36, ¶ 24.) Neal asserts that after his appointment on April 15, 2022, he submitted a complaint to Weinman about the lack of treatment he was receiving. (ECF No. 58, ¶ 12.) However, Neal's citations do not cite to an April 15 complaint, and there is no evidence of an April 15 complaint in the record.

On April 17, 2022, Neal submitted a request to extend his crutch restriction. (ECF No. 36, ¶ 25.) An unidentified nurse saw Neal on April 20, 2022, and the crutch restriction was extended. (ECF No. 36, ¶ 25.) On April 23 and May 3, 2022, Neal submitted health services requests asking about alternative treatments for his ankle. (*Id.*, ¶ 26.) These requests were forwarded to the physical therapy department, although it is unclear how the physical therapy department responded. (*Id.*, ¶ 26.)

On May 5, 2022, Neal saw the physical therapist, who "recommended that Neal continue using his walking boot, and he requested that Neal do light active or passive motion of the ankle while resting outside the boot." (ECF No. 36, ¶ 28.) On May 10, and May 11, 2022, Neal submitted seven separate requests about his ankle injury, and was scheduled to see Dr. Jeanpierre on May 13, 2022. (*Id.*, ¶¶ 29-30.) Dr. Jeanpierre

5

asserts that Neal did not show up to the May 13 appointment, which Neal asserts is a lie. (*Id.*, ¶ 30; ECF No. 52, ¶ 6.)

On May 18, 2022, Neal had an MRI of his Achilles tendon. (ECF No. 36, ¶ 31.) Neal states that the next day, May 19, 2022, non-defendant Dr. Laura Sukowaty came to his cell to discuss the MRI results. (ECF No. 58, ¶ 15.) While Neal does not support the following with citations to the record, in his brief in response he states that Dr. Sukowaty sought him out in a panic to tell him that his MRI showed "a high-grade partial tear to his right Achilles tendon located 5 centimeters proximal to its insertion site, Osteochondral defect to his anterior medial talar dome, and midfoot degenerative change." (ECF No. 48 at 6.) Dr. Sukowaty told him that he would be seeing a doctor soon to discuss treatment options, and when Neal stated he would want to have the tear surgically repaired, Dr. Sukowaty told him she wouldn't recommend surgery. (*Id.*)

The defendants do not dispute that Neal spoke with Dr. Sukowaty and note that she ordered a wheelchair for him for 90 days. (ECF No. 36, ¶ 32.) The defendants also assert that Neal met with an unidentified, non-defendant Advanced Practice Nurse Prescriber (APNP) on May 20, 2022, who "recommended conservative therapy including rest, ice, non-steroidal anti-inflammatory pain relief drugs, crutches, walking boot, and a wheelchair for distance." (*Id.*) The APNP also explained to Neal that surgery was not a typical treatment for this type of injury. (*Id.*) Neal disputes that he saw an APNP and maintains that he only spoke with Dr. Sukowaty. (ECF No. 52, ¶ 7.) The medical records show that Neal saw the APNP. (ECF. No. 37-1 at 30-31.)

6

Neal states that on June 1, 2022, "he was in accident causing further injury" and was examined by non-defendant Nurse Pitzlen. (ECF No. 58, ¶ 18.) On June 2, 2022, Dr. Jeanpierre learned of Neal's complaint of worsening pain and that he had requested a different pain medication. (ECF No. 36, ¶ 33.) In response Dr. Jeanpierre ordered 500 mg of naproxen twice a day for 90 days; lidocaine topical cream 3 times a day for 7 days; and an ice wrap for 2 weeks. (*Id.*, ¶ 34.)

The defendants assert, and the medical records confirm, that on June 21, 2022, Neal met with the physical therapist. (ECF No. 36, ¶ 35; ECF No. 37-1 at 58-59.) The physical therapist noted that Neal was not following his recommendations from the April 8, 2022, appointment. For instance, Neal was not trying to lightly bear weight on his foot. (*Id.*) Also, the physical therapist stated that Neal was overusing his walking boot and had not practiced light range of motion of the foot. (*Id.*) The physical therapist explained that the failure to follow his recommendations "has likely been a big part of why [Neal] was experiencing pain." (*Id.*) The physical therapist also recommended a consultation with an orthopedic specialist. (*Id.*) Neal asserts that all the defendants' allegations regarding physical therapy are a lie and that he had "to be for physical therapy constantly before being provided any." (ECF No. 52, ¶¶ 8-10, 13.) Neal does not provide details on when he was denied physical therapy or identify from whom he requested physical therapy.

On June 21, 2022, Neal complained to an unidentified non-defendant nurse of ankle pain, and in response Dr. Jeanpierre, as the medical records show, ordered 325 mg of acetaminophen 4 times daily for 3 days and a consultation with an orthopedic

7

specialist. (ECF No. 36, ¶¶ 38-39.) Three days later, on June 24, 2022, Neal reported to the Health Services Unit (HSU) that he was "in another accident causing further injury" and was examined by Pitzlen. (ECF No. 58, ¶ 19.) Neal does not provide details regarding the accident or what Pitzlen's observations and response were. On July 1, 2022, Neal reported to HSU that he was in another accident and that "he felt another pop in his already torn Achilles tendon." (*Id.*, ¶ 20.) Neal states that his cellmate fell on top of him coming down from his bunk. (ECF No. 49 at 7.) He was taken to HSU, and non-defendant Nurse Jenna Hilda and APNP Diana Simmons examined him. (*Id.*) Neal was given an injection and ice and noted that he was seeing an orthopedic specialist "very soon". (*Id.*)

On July 7, 2022, Neal was examined by Dr. Nelson via video conference. (ECF No. 44, ¶ 5.) Prior to the examination Dr. Nelson reviewed Neal's May 18, 2022, MRI results. (*Id.*, ¶ 7.) Dr. Nelson interpreted the MRI as showing "evidence of a partial Achilles tendon injury, which is in a subacute timeframe as of the time of the MRI." (*Id.*, ¶ 8.) At the beginning of the examination Neal told Dr. Nelson he injured himself in a basketball game approximately three months prior. (*Id.*, ¶ 10.)

Dr. Nelson then "performed a comprehensive review of systems" for Neal and "conducted a physical examination upon Mr. Neal's ankle by way of the telemedical apparatus, examining his right leg without his case boot, and noted a difference in calf muscle girth, right versus left." (ECF No. 44, ¶¶ 11-12.) Dr. Nelson confirmed that there was "evidence of a partial injury to the right Achilles tendon that was already three months old." (*Id.*, ¶ 13.) Dr. Nelson created a plan of care where he

8

recommended "a structured physical therapy program" and advised that Neal stop using the walking boot. (*Id.*, ¶ 14.) He also opined that Neal's continued issues with his ankle were a result of "disuse and deconditioning". (*Id.*) Dr. Nelson noted that Neal believed he needed surgery, which Dr. Nelson did not recommend. (*Id.*) Dr. Nelson also noted that, if Neal wanted to explore surgery, he should seek a second opinion since Dr. Nelson is not a "dedicated specialist in foot and ankle surgery." (*Id.*, ¶¶ 35-36.) Dr. Nelson transmitted all these recommendations to Neal's DOC healthcare team. (*Id.*, ¶ 37.) It is undisputed that this examination was Dr. Nelson's only encounter with Neal. (*Id.*, ¶ 42.)

Neal states that Dr. Nelson only spent three-to-five minutes examining him; did not discuss treatment options with him; ignored Neal when Neal tried to tell him he re-injured his ankle on July 1, 2022; and did not consult Neal to establish a plan of care. (ECF No. 49 at 20.) Neal also notes that Dr. Nelson admits he does not specialize in surgery, so in Neal's view Nelson was not qualified to establish a plan of care. (*Id.*)

After Dr. Nelson transmitted his opinion to Waupun's HSU, on July 19, 2022, an unidentified non-defendant APNP ordered physical therapy per Dr. Nelson's recommendation. (ECF No. 36, ¶ 44.) On July 20, 2022, Dr. Jeanpierre ordered more lidocaine cream and an extra pillow so Neal could elevate his leg. (*Id.*, ¶ 45.) That same day Neal submitted a Health Services Request (HSR) indicating he reinjured his ankle again. (ECF No. 58, ¶ 24.) He was examined by Nurse Taplin, but Neal does not explain what Taplin's findings were. (*Id.*)

On July 22, 2022, Neal saw his physical therapist, who recommended physical therapy once a week for six-to-eight weeks. (ECF No. 36, ¶ 46.) Neal was also examined by an unidentified non-defendant APNP, who discontinued his wheelchair and walking boot on the recommendation of the physical therapist. (*Id.*, ¶ 47.) Neal participated in physical therapy throughout July and August 2022, and the physical therapist noted improvements in his mobility. (*Id.*, ¶¶ 48-50.)

On August 11, 2022, Dr. Jeanpierre referred Neal to the Wisconsin Department of Corrections (DOC)'s orthopedic specialist, non-defendant Dr. Ellen O'Brien. (ECF No. 36, ¶ 51.) On August 16, 2022, Neal went to two nursing appointments in the HSU, where it was discovered that he was still using a wheelchair. (*Id.*, ¶¶ 52-54.) At the second appointment Neal requested more lidocaine. (*Id.*, ¶ 54.) Upon reviewing the notes from those appointments, Dr. Jeanpierre ordered compression socks for a year; an ace wrap; and more lidocaine. (*Id.*, ¶ 55.)

On August 18, 2022, Neal was examined by Dr. O'Brien. (ECF No. 36, ¶ 56.) Dr. O'Brien recommended that Neal start to attempt some stationary weightbearing and also ordered tests to check for blood clots. (*Id.*, ¶ 58.) The next day Neal was taken to a hospital for a blood clot test. (*Id.*, ¶ 59.) Neal tested negative for blood clots, and the doctors at the hospital recommended compression socks. (*Id.*, ¶ 60.)

Neal participated in physical therapy for the remainder of August 2022, and after each therapy session, based on the physical therapist's observations, Dr. Jeanpierre ordered more pain medication and a TheraBand. (ECF No. 36, ¶¶ 60-63.)

10

On August 30, 2022, Dr. Jeanpierre left her employment at Waupun and was no longer responsible for Neal's care. (*Id.*, ¶ 64.)

*Haseleu and Wineman's Involvement in Neal's Care*

It is undisputed that Haseleu's involvement in caring for Neal was limited to responding to three HSRs. (ECF No. 36, ¶ 71.) On April 27, 2022, Neal submitted an HSR complaining he had not received his ice bag, Aspercreme, and an ace bandage. (*Id.*, ¶ 72.) Two days later Haseleu responded to Neal's HSR, informing him she would issue an ice bag but noting he did not have an order for Aspercreme or an ace bandage. (*Id.*) On May 24, 2022, Neal submitted an HSR wherein he complained that he was not receiving any care from HSU. (*Id.*, ¶ 73.) Haseleu responded by reiterating the current plan of care in his medical records—namely, that he should rest, ice, use ibuprofen, crutches, a walking boot, and a wheelchair. (*Id.*) Also on May 24 Neal sent another HSR asking when he was scheduled to see a doctor, to which Haseleu responded by informing him that he did not have a follow-up appointment scheduled. (*Id.*, ¶ 74.) According to the defendants, Haseleu's only other involvement in Neal's care was to renew his order for crutches and a low bunk and tier restriction. (*Id.*, ¶ 75.)

Neal asserts that, because of Haseleu's position as Assistant Health Services Manager, she "influences" staff to think that Neal's "medical needs are of false value." (ECF No. 52, ¶ 22.) He also states that she ignored his requests for care and did not follow the specialists' recommendation. (ECF No. 49 at 19.) However, he offers no specific evidence explaining when and how Haseleu either influenced staff not to care for him, ignored his requests for care, or ignored the specialists' recommendations. At

most, in his response materials Neal references "HSU staff" or "HSU," which is vague and does not pin responsibility on Haseleu or any other individual.

Weinman's role in Neal's care was similarly limited. He responded only to Neal's July 8, 2022, HSR wherein Neal listed all the symptoms he was experiencing. (ECF No. 36, ¶ 14.) On July 14, 2022, Weinman responded, telling Neal he would review the specialist's notes from the July 7, 2022, appointment and determine if a second opinion would be necessary. (*Id.*, ¶ 77.) Weinman reviewed Neal's medical records and saw that his medical providers were promptly responding to his complaints of pain, that Dr. Nelson's recommended plan of care was in place, and that Neal was in physical therapy. (*Id.*, ¶ 78.) Instead of referring Neal for a second opinion, he sent Neal's HSR to an unidentified non-defendant APNP for follow-up. (*Id.*, ¶ 79.) It is unclear from the record what happened next.

As with Haseleu, Neal asserts that, because of Weinman's position, he had influence over staff decisions. (ECF No. 49 at 19.) Neal also states that Weinman ignored his requests for care and the recommendations of the specialists. (*Id.*) However, as for Haseleu, Neal provides no details of when and how Weinman acted or failed to act. Instead, Neal either describes the actions of non-defendants, or the actions of the "HSU" or "HSU Staff" generally.

*Encounters with Security Staff*

Neal also spends many pages detailing his encounters with security staff and how the security staff's actions put him at risk for further pain and injury. Neal was

12

not allowed to proceed on claims against security staff, so the court will disregard these allegations.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'"

13

*Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Neal claims that the defendants violated his Eighth Amendment rights by failing to appropriately treat his Achilles tendon injury.

A plaintiff must demonstrate four elements to establish a deliberate indifference claim under the Eighth Amendment. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). First, "there must be a risk of harm to the plaintiff that is so objectively serious as to be 'excessive' (and that risk must in fact materialize)." *Id.* Second, "the defendant must 'know' of the risk (put differently, he must possess subjective awareness that the risk exists)." *Id.* Third, "the defendant's response to the risk must be so inadequate as to constitute 'disregard' of (or deliberate indifference toward) the risk." *Id.* Finally, "the plaintiff must prove that the defendant's deliberate indifference actually *caused* his injury." *Id.* (citing *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)) (emphasis in original).

For purposes of summary judgment, the defendants do not dispute that Neal's Achilles injury is an objectively serious medical condition. (ECF No. 35 at 9.)

*Defendants Haseleu and Wineman*

It is undisputed that neither Haseleu nor Wineman examined Neal or provided him medical care, and their only involvement was to respond to a handful of HSRs. In each instance the undisputed record shows that Haseleu and Wineman appropriately responded to the HSRs. Besides responding to the HSRs, they were not obligated to

Case 2:22-cv-00832-WED   Filed 03/15/24   Page 14 of 21   Document 73

"put things to rights . . . and no prisoner is entitled to insist that one employee do another's job." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2000). Thus, to the extent Neal is arguing that they should have intervened, Haseleu and Wineman were not required to do so.

Neal also asserts that, because of their supervisory positions, Haseleu and Wineman had the ability to influence HSU staff to provide him better care. However, to hold prison officials liable in their supervisory capacity a plaintiff must demonstrate that a constitutional violation happened at the supervisor's direction or with the supervisor's knowledge and consent. *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* Neal fails to present any such evidence other his vague and unsupported assertion that Wineman and Haselau were influencing HSU staff. To the extent that Neal argues that Wineman was aware of the lack of care being provided, using his April 15 complaint as proof, there is no evidence in the record that Neal actually filed a complaint on April 15, nor does Neal provide any details about such a complaint and Wineman's alleged response.

Because no reasonable jury could conclude that Haseleu and Wineman were involved in treating Neal's Achilles injury, summary judgment is granted in their favor.

*Dr. Jeanpierre*

It is undisputed that Dr. Jeanpierre provided the bulk of Neal's treatment at Waupun. Neal asserts that she did not take his complaints seriously and minimized his injury, resulting in inadequate care. To demonstrate deliberate indifference, a plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id.* The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment*.*" *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

No reasonable factfinder could conclude that Dr. Jeanpierre was deliberately indifferent to Neal's injury. Immediately upon learning of Neal's injury through Nurse Pitzlen's April 6 report, Dr. Jeanpierre began providing treatment, including pain medication, crutches, ice, and a lower-tier (i.e., first floor/no stairs) restriction. Then, upon examining him on April 8, 2022, she adjusted her plan of care, including referring him to a physical therapist and ordering x-rays. Although Neal argues that Dr. Jeanpierre did not examine him in April 2022, the medical records directly contradict this. "Where opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 327, 376 (2007).

16

From April 2022 until her departure on August 30, 2022, the undisputed record shows that Dr. Jeanpierre provided consistent and reasonable care to Neal. The Seventh Circuit Court of Appeals has "emphasized the deference owed to the professional judgment of medical personnel." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). Only where a medical professional's "chosen 'course of treatment' departs radically from 'accepted professional practice,'" a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Id.* (quoting *Pyles*, 711 F.3d at 409). There is nothing in the record to suggest that Dr. Jeanpierre's plan of care departed from acceptable standards of practice. Neal has not demonstrated that Dr. Jeanpierre's choices were "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his serious medical condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

At most Neal vaguely asserts that Dr. Jeanpierre ignored his complaints of pain, denied him physical therapy, and downplayed his injury, but he provides no dates when she refused to provide care or details on how she failed to take his injury seriously. Neal's allegations are merely bald assertions, and bald assertions that are not bolstered by more specific evidence are insufficient to create a genuine issue of material fact. *Drake v. Minn Mining & Mfg Co.*, 134 F.3d 878, 887 (7th Cir. 1998). Similarly, many of Neal's arguments that he received inadequate care have to do with non-defendants, "HSU staff," or the "HSU" generally failing to set follow-up appointments, follow the plan of care, or treat his pain. But these allegations are insufficient to hold Dr. Jeanpierre liable. Section 1983 makes public employees liable

17

"for their own misdeeds but not for anyone else's," *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir.2009).

And no reasonable factfinder could conclude that Dr. Jeanpierre persisted in a course of treatment known to be ineffective. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Dr. Jeanpierre switched between various pain meds, obtained an x-ray and an MRI, and adjusted her care plan as she learned more, including referring Neal to both Dr. Nelson and Dr. O'Brien, who were orthopedic specialists. Once the specialists offered their opinions and recommendations, Dr. Jeanpierre was entitled to defer to them. Since the undisputed record shows she followed their recommendations, she cannot be found to be deliberately indifferent. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 462-63 (7th Cir. 2020) (holding that there is "no authority for the proposition that a [a medical provider] who *follows* the advice of a specialist . . .exhibits deliberate indifference.") (emphasis in original). Summary judgment is granted in Dr. Jeanpierre's favor.

*Dr. Nelson*

Neal asserts that Dr. Nelson's telemedical exam was insufficient and constituted deliberate indifference.

As stated above, to demonstrate that a medical professional's care constitutes deliberate indifference, Neal must show that Dr. Nelson's choices radically departed from accepted standards of care and were blatantly inappropriate. *See Zaya*, 836 F.3d at 805. "Making that showing is not easy: 'A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would

18

have so responded under those circumstances.'" *Pyles*, 771 F.3d at 409 (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). A prisoner simply disagreeing with his doctor "generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* A plaintiff needs to "submit evidence from which a jury could reasonably find that [the doctor's] exercise of medical judgment departed significantly from accepted professional norms." *Id.*

Neal does not submit any such evidence. At most he complains about the length of the exam, the fact that Dr. Nelson did not take into account the July 1, 2022, injury, did not consult him on a plan of care, and did not recommend (nor was an expert in) surgery. Even taking the facts in the light most favorable to Neal, Dr. Nelson's perceived deficiencies, at most, amount to medical malpractice, which is insufficient to establish deliberate indifference. *See Petties,* 836 F.3d at 728. Additionally, it is undisputed that several other medical professionals, including APNPs and Dr. Sukawtony, believed that surgery was not appropriate to address Neal's Achilles injury.

No reasonable jury could conclude that Dr. Nelson's treatment constitutes deliberate indifference, and summary judgment is granted in Dr. Nelson's favor.

Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). "It is therefore incumbent on the party opposing a summary judgment motion to 'inform the district court of the reasons why summary judgment should not

19

be entered'" *Reed v. Brex, Inc.*, 8 F. 4th. 569, 578 (7th Cir. 2021) (quoting *Riely v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)). Neal's evidence is too vague, does not appropriately identify the actors, and does not demonstrate that the defendants' care was blatantly inappropriate. At most, he argues that, because his Achilles was not surgically repaired, the defendants must be deliberately indifferent. but, as stated above, whether the plaintiff believes some other course of treatment would have been better does not amount to deliberate indifference on the defendants' part. *See Snipes*, 95 F.3d at 591.

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment are granted. The State Defendants also argued that they were entitled to qualified immunity, but because the court granted summary judgment in their favor on the merits, it does not need to address the qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the State Defendants' motion for summary judgment (ECF No. 34) and Dr. Nelson's motion for summary judgement (ECF No. 40) are **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this

20

court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 15th day of March, 2024.


BY THE COURT


WILLIAM E. DUFFIN
United States Magistrate Judge